**TRANSPORTATION LEASING COMPANY; et al.,**
Plaintiffs,

v.

**The STATE OF CALIFORNIA (CalTrans), et al.,**
Defendants.

**No. CV 89–7368–WMB.**

United States District Court, C.D. California.

Jan. 29, 1993.

---

934

## AMENDED ORDER

WM. MATTHEW BYRNE, Jr., Chief Judge.

## I. BACKGROUND

### A. *History of the Action*

This action arises out of efforts to clean up hazardous substances at a facility in Monterey Park, California, known as the Operating Industries, Inc. (OII) landfill.

In 1988, the United States Environmental Protection Agency (EPA), the State of California, and the California Hazardous Substance Account sued a number of parties, including plaintiffs in this action, alleging that those parties were liable to perform certain remedial actions at the OII landfill and to reimburse the United States and the State of California for response costs incurred in abating various hazardous conditions at the landfill.

The 1988 action was settled with a Partial Consent decree entered on May 11, 1989.

Under the terms of the decree, plaintiffs here agreed to perform certain work at the OII landfill and to pay approximately $61,-000,000 to the EPA and the State of California. However, plaintiffs expressly reserved the right to assert claims for reimbursement and indemnification against other potentially liable persons who were not signatories of the decree.

Plaintiffs now assert that right by bringing this action against fourteen municipal defendants,[1] the County of Los Angeles and five County Garbage Disposal Districts (GDDs),[2] and the State of California Department of Transportation (CalTrans). Plaintiffs seek to recover from these defendants a fair share of the costs incurred pursuant to the Partial Consent Decree, on the grounds that (1) defendants either owned, operated, or utilized the OII landfill, and (2) defendants were not signatories of the decree.[3]

On December 5, 1990, the Court issued an Order denying in part and granting in part defendant cities' motion for an order specifying issues without substantial controversy. The Court granted defendant cities' motion to specify that "[r]ubbish generated by residences and businesses located within the city limits of defendant cities is not a 'hazardous substance' under CERCLA absent specific evidence that the particular rubbish generated by those residences and businesses that was disposed of at the OII landfill site contained 'hazardous substances' as defined by CERCLA § 101(14)" only to the extent that it sought a ruling that for arranger liability, plaintiffs must prove that the waste disposed of at the OII landfill contained "hazardous substances" under CERCLA. Additionally, the Court found that CERCLA § 101(14) does not expressly exempt from liability the disposal of household wastes. The Court denied defendants' motion with regard to all remaining issues presented.

In its order of September 24, 1991 (Sept. Order), the Court found the following issues were without substantial controversy:

1) A "release" of a "hazardous substance," as those terms are defined in CERCLA §§ 101(14), 101(33) has occurred at the OII landfill;

2) In connection with the OII site, plaintiffs have incurred "necessary costs of response" that are "consistent with the national contingency plan" within the meaning of CERCLA § 107(a)(4)(B);

3) By contracting with a disposal company for the collection and disposal of the waste of city residents, defendant City of Alhambra "by contract, agreement, or otherwise arranged for disposal ... or arranged with a transporter for transport for disposal" of that residential waste, within the meaning of CERCLA § 107(a)(3).

The Court further ruled that liability under § 107(a)(3) requires proof that defendants "owned or possessed" the hazardous substances for which defendants arranged for disposal and that plaintiffs could satisfy this requirement by showing constructive, as well as actual, ownership or possession.

## II. DISCUSSION

■ Plaintiffs claim defendants fall within the class of persons liable as an arranger under CERCLA § 107(a)(3). Arrangers liable under CERCLA include:

---

1. Plaintiffs originally named 29 cities as defendants. During 1991, plaintiffs dismissed five defendant cities: Baldwin Park, Artesia, Walnut, Santa Fe Springs, and City of Industry. In early 1992, plaintiffs settled with 10 defendant cities: El Monte, Sierra Madre, South El Monte, Paramount, San Marino, Huntington Park, Norwalk, Beverly Hills, La Puente, and Bell Gardens. Stipulated judgments have been entered as to these ten defendants.

2. The West Hollywood–Sherman GDD is not named as a separate defendant because it no longer exists. The court will still make findings of fact and conclusions of law concerning this GDD because the County is liable for waste collected in West Hollywood–Sherman to the same extent that it is liable for the waste collected in the five GDDs that are named defendants. Furthermore, in this order, when the Court refers to the GDDs as a group, without naming them individually, the parties should understand that West Hollywood–Sherman is meant to be included within the meaning of the term "GDDs."

3. On July 16, 1990, the Court granted the municipal defendants' motion to dismiss the pendent state claims. The only claims remaining in this action are the first and the second claims under CERCLA, and the portion of the fifth claim under the Declaratory Judgments Act.

Any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

CERCLA § 107(a)(3); 42 U.S.C. § 9607(a)(3). To be liable as an arranger, the substances disposed of must have been "hazardous" under CERCLA,[4] the liable party must have "owned or possessed" the substances, and it must have "arranged" for their disposal.

Phase I of this action presents three categories of issues. First, the parties have identified several legal issues for pre-trial legal determination. Second, the Court will determine whether defendants "arranged with a transporter for transport for disposal" within the meaning of CERCLA § 107(a)(3). Lastly, the Court will determine if defendants "owned or possessed" the waste for which they arranged disposal within the meaning of CERCLA § 107(a)(3).[5]

### A. Pre–Trial Legal Determinations

1. *Do Plaintiffs Have Standing To Sue For Cost Recovery Under CERCLA § 107 or Are They Limited to Remedies For Contribution Under CERCLA § 113(f)?*

Plaintiffs have brought this action under CERCLA § 107(a)(3), which imposes liability on arrangers for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan." CERCLA § 107(a)(4); 42 U.S.C. § 9607(a)(4). Defendants argue plaintiffs

may not bring an action to recover response costs under § 107.

Each group of defendants takes a different position on this issue. The County defendants argue the enactment of CERCLA § 113(f) in the Superfund Amendments and Reauthorization Act of 1986 (SARA), makes an action for contribution under § 113(f) the only remedy available to plaintiffs against defendants. Section 113(f)(1) provides that:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.... In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

CERCLA § 113(f)(1); 42 U.S.C. § 9613(f)(1).

Defendant cities argue this issue is not susceptible to pre-trial determination because the decision on whether to utilize § 107(a) or § 113(f) depends on the specific facts of this case. CalTrans does not address the § 107/§ 113 issue in its papers.

### a. *Can This Issue Be Determined Pre–Trial?*

In addition to determining whether or not plaintiffs can bring suit under § 107, the parties have requested the Court to decide before trial whether defendants can be held jointly and severally liable. Defendant cities seem to view the question of whether plaintiffs can sue under § 107 as another way of determining the joint and several liability question.

Defendant cities apparently equate § 107 with joint and several liability and § 113(f) with several liability. The cities argue plaintiffs are limited to a contribution remedy under § 113(f) absent a showing justifying joint and several liability. Unless an individ-

---

4. Under CERCLA, the term "hazardous substance" is defined broadly and includes any substance designated as hazardous by the EPA under CERCLA § 102 or other legislative acts including the Solid Waste Disposal Act, the Clean Air Act, the Clean Water Act of 1977, and the Toxic Substances Control Act. CERCLA § 101(14); 42 U.S.C. § 9601(14).

5. This phase of this action was heard on stipulated facts. The Court adopts the stipulated facts as its findings of fact and issues this order as its conclusions of law. Fed.R.Civ.P. 52.

ual defendant can show that the harm caused by that defendant is divisible and that a reasonable basis for apportionment of damages exists, liability under § 107 is joint and several. *United States v. Chem–Dyne,* 572 F.Supp. 802, 811 (S.D.Ohio 1983).

Under § 113(f), on the other hand, the court may allocate response costs using such equitable facts as the court determines appropriate. According to defendant cities, neither the § 107/§ 113 issue nor the issue of joint and several liability can be determined before trial because the divisibility of the harm depends on the particular facts of this case.

The question of whether plaintiffs can bring suit under § 107(a) does not depend on whether defendants may be held jointly and severally liable. Similarly, the question of whether joint or several liability applies does not determine whether this action can be brought under § 107 or must be brought under § 113. This issue can be resolved before trial.

### b. Can Plaintiffs Bring This Action under § 107?

Section 107 makes certain persons, such as arrangers, liable for any "necessary costs of response incurred by any other person consistent with the national contingency plan." CERCLA § 107(a)(4); 42 U.S.C. § 9607(a)(4). In its September order, the Court found plaintiffs have incurred "necessary costs of response . . . consistent with the national contingency plan." Sept. Order at 20. Plaintiffs thus conclude they are entitled to bring an action against alleged arrangers such as defendants under § 107(a) to recover the response costs they have incurred.

In the face of this statutory language, the County defendants argue that potentially responsible parties (PRPs) whose liability is based on a judgment (such as the consent decree entered against plaintiffs) are entitled to contribution under § 113(f)(1) but not full indemnity under § 107(a). Section 107(a)(4) allows a plaintiff to recover all its response costs. Section 113(f)(1), on the other hand, does not allow a plaintiff to recover all its costs. Instead, it allows persons liable or potentially liable under § 107(a) to "seek con-

tribution from any other person who is liable or potentially liable" and provides that the court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

When it was originally enacted, CERCLA did not provide a mechanism for a PRP held jointly and severally liable for cleanup costs to seek contribution from other PRPs. In the absence of such a provision, courts implied a private right of contribution into the statutory scheme. *See Sand Springs Home v. Interplastic Corp.,* 670 F.Supp. 913, 916–17 (N.D.Okla.1987); *United States v. New Castle County,* 642 F.Supp. 1258 (D.Del.1986). Congress ratified this approach in SARA by adding § 113(f) to CERCLA.

The County argues § 113(f)'s enactment demonstrates that indemnity under § 107 is limited to situations in which a PRP promptly and voluntarily cleans up a site without the necessity of a lawsuit. The County defendants claim PRPs such as plaintiffs, who incur response costs pursuant to a court order (in plaintiffs' case, the partial consent decree in the 1988 action), cannot obtain full indemnity under § 107(a) but are instead limited to contribution under § 113(f)(1) from other PRPs.

The cases which have compared and contrasted sections 107(a) and 113(f) have concluded PRPs can bring actions under § 107(a). In *General Elec. Co. v. Litton Indus. Automation Sys., Inc.,* defendant Litton contended plaintiff General Electric (GE) could not bring suit under § 107(a) because GE did not incur response costs until after GE was threatened with a lawsuit. 920 F.2d 1415, 1418 (8th Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991). The court rejected this argument, holding that:

the motives of the private party attempting to recoup response costs under 42 U.S.C. § 9607(a)(4)(B) are irrelevant. The purpose of allowing a private party to recover its response costs is to encourage timely cleanup of hazardous waste sites. This purpose would be frustrated if a plaintiff's motives were subject to question. We will

not look at the impetus behind a plaintiff's decision to begin the cleanup process; we will look only to see if there has been a release or threatened release for which the defendant is responsible.

*Id.*

*United States v. Kramer* contains perhaps the most detailed discussion of the differences between § 107(a) actions and § 113(f) actions. 757 F.Supp. 397 (D.N.J.1991). In *Kramer*, the United States brought an action against various defendants under § 107(a) to recover its response costs. Defendants argued the government's action was properly characterized as a § 113(f) action because the United States generated large amounts of the waste at the site. *Id.* at 413. The court held:

> The Government's potential liability for contribution does not affect this section 107(a) response cost recovery action. The Government's potential liability alters neither the type of affirmative defenses permissible under section 107(a), nor the Government's right to full recovery of its response costs. Defendants are correct that the Government's ultimate recovery of its response costs would be decreased, once it was found liable for contribution and the amount to be apportioned to it of total response costs was determined. However, it is in the nature of the claims made, that even when, as here, a section 107(a) claim co-exists in a single action with section 113 contribution claims, defendants' liability on the Government's section 107(a) claim almost certainly will be determined before the Government's liability for contribution.

*Id.* at 414. The court went on to state: the structure of CERCLA does not preclude consideration of equitable factors, including the liability of a PRP who was (or is) a plaintiff in a section 107 action. Rather, CERCLA separates those equitable factors from section 107 and considers them in a section 113 contribution action.... [S]ections 107 and 113 serve distinct purposes.... Section 107 permits the Government or a private party to go in, clean up the mess, pay the bill, then collect *all* its costs not inconsistent with the NCP from other responsible parties—even if plaintiff was also responsible for the contamination. Any PRP is entitled under section 113 to bring a contribution action against other PRPs—including the PRP who previously cleaned up the mess and was paid for its trouble through a section 107 proceeding—to apportion costs equitably among all the PRPs. Practically speaking, section 107 permits a PRP, including the Government, to collect all its response costs, even those that same PRP may be required to pay back to other PRPs as its equitable share in a section 113 proceeding.

*Id.* at 416 (emphasis in original). Other courts have reached the same conclusion, albeit not necessarily for the same reasons. *E.g., Sand Springs Home v. Interplastic Corp.,* 670 F.Supp. 913, 916 (N.D.Okla.1987); *Chemical Waste Management, Inc. v. Armstrong World Indus., Inc.,* 669 F.Supp. 1285, 1291–92 (E.D.Pa.1987).[6] The County defendants distinguish the above cases by arguing that each involved either an innocent landowner, *e.g., General Electric,* or PRPs who voluntarily incurred response costs before being forced to do so by judicial decree, *e.g., Kramer.*

CERCLA permits plaintiffs to sue under § 107. Section 113 does not abrogate § 107 but instead codifies the efforts of federal courts to imply a contribution remedy to assist those held jointly and severally liable. No reported decision has drawn the distinction suggested by the County defendants, and numerous courts have rejected similar arguments. Plaintiffs have incurred necessary response costs, and § 107(a)(4)(B) explicitly states arrangers shall be liable for any necessary costs of response incurred by any other person consistent with the NCP.

2. *Do Public Policy Considerations and Regard For a City's Sovereign Power to Protect the Public Health, Safety, and Welfare Preclude Imposition of CERCLA Liability?*

Defendant cities claim they are exempt from CERCLA liability because they were

---

**6.** *Chemical Waste* does not properly differentiate between § 107 and § 113. In that case, the court allowed plaintiffs to sue under § 107, which imposes liability for any necessary response costs, but then applied the legal standards of § 113 to limit plaintiff's potential recovery in the § 107 action. *See* 669 F.Supp. at 1292 & n. 10.

exercising sovereign power to abate a public nuisance and to protect the public health, safety, and welfare. Defendants claim both CERCLA § 101(20)(D) and considerations of public policy support such an exemption. In making this argument, defendant cities rely almost exclusively on *Lincoln v. Republic Ecology,* 765 F.Supp. 633 (C.D.Cal.1991).

In *Lincoln,* plaintiffs alleged the City of Pasadena was liable as an arranger based upon contracts which the city had signed with private companies providing for the towing of vehicles abandoned on public streets. The *Lincoln* court granted the city's motion for summary judgment, holding that:

> an unmistakable purpose behind CERC-LA's strict liability standard was to force parties who *profit* from the use and generation of hazardous wastes, or directly cause or contribute to their release, to account, in the pricing of their products, for the environmental externalities associated with improper disposal. This rationale simply does not apply to the City's abatement of public nuisances.

*Id.* at 635–36 (emphasis in original). The court went on to state that:

> strict liability under CERCLA should not attach to government entities engaged in legitimate sovereign, as opposed to proprietary or commercial, functions. This is especially true when, as here, the City had no "hands on" involvement with or control over the hazardous substances and enjoyed no commercial interest or benefits by virtue of the regulatory legislation.

*Id.* at 637–38. The municipal defendants conclude that *Lincoln* should apply to exempt them for liability for their conduct in this case because their regulation of waste collection, like the City of Pasadena's activity in *Lincoln,* constituted a "non-contributory exercise of sovereign power."

Faced with this argument, the Second Circuit recently rejected defendant cities' interpretation of *Lincoln* in *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1199 (2d Cir.1992). In *Murtha,* plaintiffs and defendants alleged several municipalities were liable under § 107(a)(3) because they had arranged for the disposal and/or treatment of hazardous substances at two landfills. *Id.* at 1196. The

municipalities cited *Lincoln* for the proposition that liability could not attach to municipalities which arranged for the disposal or treatment of hazardous substances in their sovereign capacity. *Id.* at 1199. The Second Circuit rejected the argument, stating:

> We regard *Lincoln* as merely holding that the city's activities in that case, taken in furtherance of its sovereign function to abate public nuisances, were insufficient to give rise to "arranger" status for purposes of liability under CERCLA. *See id.* at 636–38. To the extent *Lincoln* can be construed as extending the "function as a sovereign" exception beyond the liability provision for owners or operators to that for arrangers, we disagree with it. Congress limited the sovereign function exception to those situations where liability is premised on the state or local government entity being an "owner or operator" of a vessel or facility. Nothing in the language of the Act suggests that it be extended.

*Id.* (citations omitted).

■ *Murtha's* interpretation of *Lincoln* is persuasive. A governmental body is not automatically foreclosed from CERCLA liability merely because it is acting in a regulatory capacity pursuant to a statutory mandate. *United States v. New Castle County,* 727 F.Supp. 854, 875 (D.Del.1989). Indeed, this Court has already implicitly rejected the cities' argument in its September order by finding a defendant city could be held liable under § 107(a)(3) if the prerequisites of the statute are met. Congress intended that state governmental entities be liable along with everyone else for cleanup costs recoverable under CERCLA. Thus, they may be liable under any circumstance described in § 107(a) from which they were not expressly excluded. *Cf. Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 7, 109 S.Ct. 2273, 2278, 105 L.Ed.2d 1 (1989).

### 3. Joint and Several Liability

■ All defendants dispute whether plaintiffs are entitled to joint and several liability. Regardless of whether plaintiffs are allowed to sue under § 107(a) or are limited to § 113(f), the County defendants and Cal-

Trans argue this Court should apply several liability. Defendant cities appear to argue the Court's decision on whether or not to impose joint and several liability follows from its decision with regard to whether plaintiffs can sue under § 107(a). The cities argue the Court has discretion to impose or not to impose joint or several liability depending on the facts of the case and equitable considerations, citing *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 691 F.Supp. 1100, 1116 (N.D.Ill.1988); *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808 (S.D.Ohio 1983).

In *Chem–Dyne*, the court interpreted the scope of liability under § 107:

> If the harm is divisible and if there is a reasonable basis for apportionment of damages, each defendant is liable for only the portion of harm he himself caused. In this situation, the burden of proof as to apportionment is upon each defendant. On the other hand, if the defendants caused an indivisible harm, each is subject to liability for the entire harm.

572 F.Supp. 802, 811 (S.D.Ohio 1983). The majority of courts have adopted *Chem–Dyne*'s holding. *See O'Neil v. Picillo*, 883 F.2d 176, 178 (1st Cir.1989) (citing cases), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990).[7]

Plaintiffs assert courts have consistently and unanimously held CERCLA imposes joint and several liability. *E.g., County Line Investment Co. v. Tinney*, 933 F.2d 1508, 1516 (10th Cir.1991); *O'Neil*, 883 F.2d at 178–79; *United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). However, plaintiffs themselves recognize that the majority of courts will apportion damages when defendants can demonstrate that the harm is divisible. *E.g., O'Neil*, 883 F.2d at 178.

With regard to the issue of joint and several liability, the Court holds joint and several liability applies under § 107. However, individual defendants may be entitled to several liability if they can show the harm they

caused is divisible. The parties dispute the divisibility of the harm caused at the OII site. While plaintiffs claim the harm at OII is indivisible, defendants claim the harm is divisible. The parties have presented no evidence to suggest whether the harm is divisible or indivisible because the question of divisibility involves issues not before the Court in this phase of the case. Because the divisibility of the harm cannot be resolved at the present time, the Court's final decision on joint and several liability must wait until it considers evidence relating to the divisibility of harm.

### 4. Does the Doctrine of 'De Minimis Non Curat Lex' Absolve Defendants From Liability?

Defendant cities argue that a cost recovery or contribution action under CERCLA amounts to an equitable proceeding for restitution in which equitable defenses, particularly 'de minimis non curat lex,' should apply. Some courts have recognized the availability of equitable defenses in cost recovery actions under CERCLA § 107. *E.g., United States v. Mottolo*, 695 F.Supp. 615, 626–27 (D.N.H.1988); *United States v. Hardage*, 116 F.R.D. 460 (W.D.Okla.1987).

Relying on the above, defendant cities argue the Court can apply, if appropriate, 'de minimis non curat lex' (the law does not concern itself with trifles) to this action. Defendant cities realize the application of this doctrine depends on the introduction of evidence regarding the amount and toxicity of the waste attributable to the cities. Accordingly, the cities request only a ruling that they may assert this defense at the appropriate time.

Section 107(a) states those arranging for the transport for disposal of hazardous waste which they own or possess shall be liable "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section." Section 107(b) does not set forth the defense of 'de minimis non curat lex.'

---

7. Defendant cities further suggest the Gore Amendment factors present consideration the Court can take into account when determining whether joint and several liability is appropriate.

*United States v. A & F Materials*, 578 F.Supp. 1249, 1256–57 (S.D.Ill.1984). As plaintiffs point out, however, most appellate decisions have refused to follow the approach of *A & F Materials*.

Numerous courts have construed § 107(b) as precluding all defenses not enumerated in CERCLA. *E.g., United States v. Bliss,* 667 F.Supp. 1298, 1304 (E.D.Mo.1987); *United States v. Stringfellow,* 661 F.Supp. 1053, 1061–62 (C.D.Cal.1987). Given the Court's finding that plaintiffs can sue under § 107(a), 'de minimis non curat lex' is not an available defense because § 107(b) limits the defenses available. "The principle of 'de minimis non curat lex' (the law does not concern itself with trifles) is simply not a defense to CERCLA liability." *United States v. Western Processing Co.,* 734 F.Supp. 930, 936 (W.D.Wash.1990).

## B. *The First Trial Phase*

Plaintiffs claim defendants fall within the class of persons liable as an arranger under CERCLA § 107(a)(3). Arrangers liable under CERCLA include:

> Any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

CERCLA § 107(a)(3); 42 U.S.C. § 9607(a)(3). To be liable as an arranger, the substances disposed of must have been "hazardous" under CERCLA, the liable party must have "owned or possessed" the substances, and it must have "arranged" for their disposal.

For the purposes of this phase of the trial, the Court will determine only if the defendants "arranged for transport for disposal" of waste "owned or possessed" by defendants. Later phases of this action will determine issues such as the volume of the waste and whether or not the waste contained hazardous substances.

### 1. *Arranger Issues*

In its last order, the Court delineated three principles which have emerged from the case law to guide determinations of

whether a particular contract or agreement constitutes an arrangement for disposal:

> First, courts have not hesitated to look beyond a defendant's characterizations to determine whether a transaction in fact involved an arrangement for the disposal of a hazardous substance. Second, if persons have a legal responsibility for disposal of hazardous substances, they cannot evade liability if they do nothing and simply "close their eyes" to the method of disposal of their hazardous substances. Third, courts have stated that "a liberal judicial interpretation of the term is required in order (to) achieve CERCLA's 'overwhelming remedial' statutory scheme."

Sept. Order at 26 (citations omitted). The Court applied these principles to find that defendant City of Alhambra could be held liable as an arranger because the city had contracted with a disposal company for the transportation and disposal of its residential waste.

### a. *The Defendant Cities*

Plaintiffs argue each defendant city arranged for transport for disposal by contracting with waste haulers to pick up waste within the city. In addition, plaintiffs argue five defendant cities (Bell, Commerce, Compton, Lynwood, and South Gate) arranged for disposal by licensing waste haulers to operate within those cities.

#### i. *Contractual Agreements With Waste Haulers*

▮ Defendant cities raise three basic arguments on the arranger by contract issue. First, they point to the language of § 107(a)(3), which states defendants must have arranged for the disposal of "hazardous substances." Defendant cities claim they are not arrangers because the contracts at issue said nothing about hazardous substances.

It is undisputed defendant cities contracted with disposal companies to transport residential, commercial, and governmental waste for disposal. In other cases, courts have not hesitated to look beyond a defendant's characterizations to determine whether a transaction in fact involved an arrangement for the disposal of a hazardous substance. *See* Sept.

Order at 26. The fact that the contracts at issue in this case did not specifically mention hazardous substances does not prevent defendant cities from being held to be arrangers.

▮ Second, defendant cities point out that § 107(a)(3) imposes liability on those who arrange for transport for disposal to a "facility." Defendant cities argue their contracts with private waste haulers do not qualify as arrangements because no city picked OII as the site for waste from within the city to be dumped.

In its most recent order, the Court noted that "it is well settled that one who contracts for disposal has 'arranged' for disposal even if the contract does not mention the disposal site." Sept. Order at 22. One who contracts for disposal has "arranged" for disposal even if the contract does not mention the disposal site. *Id.* at 48. Defendant cities did not have to pick OII as the site to qualify as arrangers under § 107(a)(3). By contracting with disposal companies, the municipal defendants arranged for waste to be taken to a facility. The fact they did not pick OII as the final destination is not determinative.

Lastly, defendant cities reiterate the policy arguments they make in asserting their sovereign power defense, namely that considerations of public policy should prevent the imposition of CERCLA liability on municipalities. As stated above, the Court does not find those policy arguments persuasive under the facts of this case. As stated below, the Court finds the stipulated facts demonstrate each municipal defendant arranged with a transporter for transport for disposal within the meaning of CERCLA § 107(a)(3).

In discussing the arranger issue, plaintiffs and defendant cities have divided the waste collected by the disposal companies into three categories. The first category is "residential waste"—refuse from households and apartments within the defendant city. The second category is "commercial waste"—refuse from businesses located with the defendant city. The third category is "governmental waste"—waste from governmental operations and city refuse receptacles. In making its findings, the Court adopts this nomenclature.

### 1. *Alhambra*

Alhambra arranged with a transporter for transport for disposal of residential waste by contracting with CV Disposal and Athens Disposal from 1960 to 1984. [1.2; 1.3] Alhambra's contracts with Athens Disposal further provided Athens would collect, transport, and dispose of governmental waste and some commercial waste. [1.4; 1.5] Based on the stipulated facts, the Court finds Alhambra arranged with a transporter for transport for disposal of residential, commercial, and governmental waste within the meaning of CERCLA § 107(a)(3) from 1960 to 1984.

### 2. *Bell*

Bell contracted with System Disposal Services, Inc. (System Disposal) to collect, transport, and dispose of residential and governmental waste from 1970 to 1984. [2.2] The Court finds Bell arranged with a transporter for transport for disposal of residential and governmental waste within the meaning of CERCLA § 107(a)(3) from 1970 to 1984.

### 3. *Commerce*

From 1962 until 1977, Commerce contracted with O.G. Cannavo to collect, transport, and dispose of residential waste. [5.2] From 1977 until 1984, Commerce contracted with Metropolitan Waste Disposal Company to collect, transport, and dispose of residential waste. [5.4] The Court finds Commerce arranged with a transporter for transport for disposal of residential waste within the meaning of CERCLA § 107(a)(3) from 1962 until 1984.

In 1976 and 1977, the Commerce–Cannavo contracts required Cannavo to collect, transport and dispose of Commerce governmental refuse. [5.3] The Commerce–Metropolitan contracts from 1977 to 1984 required Metropolitan to collect, transport, and dispose of Commerce governmental refuse. [5.5] The Court finds Commerce arranged with a transporter for transport for disposal of governmental waste within the meaning of CERCLA § 107(a)(3) from 1976 to 1984.

### 4. *Compton*

Compton contracted with Murcole, Inc. to collect, transport and dispose of residential

waste from 1969 to 1984 except for a portion of East Compton and the 'Nestor Tract' from 1975–1980. [6.2] The Compton–Murcole contracts also covered Compton governmental waste from 1969 to 1984. [6.3] The Court finds Compton arranged with a transporter for transport for disposal of residential and governmental waste within the meaning of CERCLA § 107(a)(3) from 1969 to 1984.

### 5. *Cudahy*

From 1981 to 1984, Cudahy contracted with System to collect, transport and dispose of residential and governmental waste from Cudahy. [7.2] The Court finds Cudahy arranged with a transporter for transport for disposal of residential and governmental waste within the meaning of CERCLA § 107(a)(3) from 1981 to 1984.

### 6. *Lynwood*

Lynwood contracted with CV Disposal Service from 1962 to 1984 to collect, transport and dispose of residential and commercial waste. [12.2; 12.3] From 1978 to 1984, the Lynwood–CV contracts required CV to collect, transport, and dispose of governmental waste as well. [12.4] The Court finds Lynwood arranged with a transporter for transport for disposal within the meaning of CERCLA § 107(a)(3) of residential and commercial waste from 1962 to 1984, and for disposal of government waste from 1978 to 1984.

### 7. *Maywood*

From 1958 to 1972 Maywood contracted with Pacific Waste Disposal Company, a transporter, to collect, transport, and dispose of residential and governmental waste. [13.3; 13.8] From 1958 to 1970, the Maywood–Pacific contracts required Pacific to collect, transport, and dispose of commercial waste. [13.6] From 1972 to 1984, Maywood contracted with System Disposal to collect, transport, and dispose of residential and governmental waste. [13.4; 13.9]

The Court finds Maywood arranged with a transporter for transport for disposal of residential and governmental waste within the meaning of CERCLA § 107(a)(3) from 1958 to 1984. The Court further finds Maywood arranged with a transporter for transport for disposal of commercial waste within the meaning of CERCLA § 107(a)(3) from 1958 to 1970.

### 8. *Montebello*

From 1952 to 1958, Montebello contracted with Michael Harabedian and George Slater to collect, transport, and dispose of residential and commercial waste. [14.2] From 1962 to 1984, Montebello contracted with Athens Disposal to collect, transport, and dispose of residential, commercial, and governmental waste. [14.7; 14.10]

The Court finds Montebello arranged with a transporter for transport for disposal within the meaning of CERCLA § 107(a)(3) of residential and commercial waste from 1952–1958 and from 1962–1984. The Court further finds Montebello arranged with a transporter for transport for disposal of governmental waste within the meaning of CERCLA § 107(a)(3) from 1962–1984.

### 9. *Monterey Park*

Monterey Park contracted with Michael Harabedian to collect, transport, and dispose of residential waste from 1947–1958. [15.2] Monterey Park contracted with CV Disposal to collect, transport, and dispose of residential and governmental waste from 1960–1970. [15.3; 15.5] From 1970 until 1984, Monterey Park contracted with Athens Disposal to collect, transport, and dispose of residential and governmental waste. [15.4; 15.6]

The Court finds Monterey Park arranged with a transporter for transport for disposal of residential and governmental waste within the meaning of CERCLA § 107(a)(3) from 1960–1984. The Court also finds Monterey Park arranged with a transporter for transport for disposal of residential waste within the meaning of CERCLA § 107(a)(3) from 1947–1958.

### 10. *Rosemead*

Rosemead contracted with Dick Griegorian (doing business as Griegorian Disposal Service and Modern Service Co.) to collect, transport, and dispose of residential waste from 1961 until 1984. [18.2] During the period 1965–1984, the Rosemead–Griegorian contracts required Griegorian to collect, transport, and dispose of commercial and governmental waste. [18.3; 18.4]

The Court finds Rosemead arranged with a transporter for transport for disposal of residential waste within the meaning of CERCLA § 107(a)(3) from 1961–1964, and for disposal of residential, commercial, and governmental waste within the meaning of CERCLA § 107(a)(3) from 1965–1984.

### 11. San Gabriel

San Gabriel contracted with George Solomon to collect, transport and dispose of residential and commercial waste from 1948 to 1956. [19.2] During 1954–1956, the San Gabriel–Solomon contracts provided that Solomon would also collect, transport, and dispose of governmental refuse. [19.3] From 1957 to 1964, San Gabriel contracted with Community Disposal Company to collect, transport, and dispose of residential, commercial, and governmental waste. [19.8; 19.9]

In 1956–1957, and from 1964–1984, San Gabriel contracted with San Gabriel Valley Disposal Company (also known as San Gabriel Disposal Company) to collect transport and dispose of residential, commercial, and governmental waste. [19.5; 19.6; 19.7] Based on this series of contracts, the Court finds San Gabriel arranged with a transporter for transport for disposal of residential, commercial, and governmental waste within the meaning of CERCLA § 107(a)(3) from 1948–1984.

### 12. South Gate

From 1955–1957, South Gate contracted with System Disposal to collect, transport, and dispose of residential and commercial waste. [23.2] From 1957–1962, South Gate contracted with Santa Ana Commercial for collection, transportation, and disposal of residential and commercial waste. [23.4] From September 26 to December 15, 1962, the South Gate–Santa Ana contract provided for collection, transportation and disposal of South Gate governmental waste as well. [Id.]

From 1962–1967, South Gate contracted with Andrew Hohn to collect, transport, and dispose of residential, commercial, and governmental waste. [23.5] From 1967 to 1984, South Gate contracted with CV Disposal Service to collect, transport, and dispose of residential and governmental waste. [23.6]

The Court finds that by making these contracts, South Gate arranged with a transporter for transport for disposal of residential waste within the meaning of CERCLA § 107(a)(3) from 1955–1984, of commercial waste within the meaning of CERCLA § 107(a)(3) from 1955–1967, and of governmental waste within the meaning of CERCLA § 107(a)(3) from Sept. 26, 1962 to 1984.

### 13. South Pasadena

From 1950 to 1979, South Pasadena contracted with South Pasadena Rubbish Company and South Pasadena Disposal Company to collect, transport, and dispose of residential and commercial waste. [24.1; 24.2] From 1979 to 1984, South Pasadena contracted with Ronara to collect, transport, and dispose of residential, commercial, and governmental waste. [24.4; 24.5; 24.6] Based on these contracts, the Court finds South Pasadena arranged with a transporter for transport for disposal of residential and commercial waste within the meaning of CERCLA § 107(a)(3) from 1950–1984, and of governmental waste within the meaning of CERCLA § 107(a)(3) from 1979–1984.

### 14. Temple City

From 1960 to 1984, Temple City contracted with Community Disposal to collect, transport and dispose of residential, commercial, and governmental waste. [25.1; 25.2; 25.3] Accordingly, the Court finds Temple City arranged with a transporter for transport for disposal of residential, commercial, and governmental waste within the meaning of CERCLA § 107(a)(3) from 1960–1984.

### b. Licenses

■ Plaintiffs claim the issuance of business licenses by five municipal defendants (Bell, Commerce, Compton, Lynwood, and South Gate) which permitted a waste hauler to conduct business within city limits constituted an "arrangement" subjecting the cities to liability under CERCLA § 107(a)(3). These five defendants claim the licenses they issued were generic licenses no different than those issued to other types of businesses. Plaintiffs claim the licenses issued by these five defendants were not generic busi-

ness licenses but explicit permits to collect and dispose of refuse. The parties have stipulated that Bell licensed a hauler to collect and dispose of commercial waste [2.33], Commerce licensed a hauler to collect and dispose of commercial waste [5.46], Compton licensed a hauler to engage in the business of rubbish collection within Compton [6.57], Lynwood licensed two haulers to operate refuse collection and disposal businesses in Lynwood [12.21, 12.23], and South Gate licensed three different haulers to collect and dispose of commercial waste [23.57–23.59].

California law requires municipal corporations like defendants "to make adequate provision for solid waste handling . . . within their respective jurisdictions." Cal.Pub.Res. Code § 40002. Municipalities can fulfill this duty by delegating it to private parties through a "nonexclusive franchise." *Id.* at § 40059.[8] Plaintiffs argue Bell, Commerce, Compton, Lynwood, and South Gate arranged within the meaning of CERCLA § 107(a)(3) because each had a statutory duty to arrange for disposal of waste, their licensing of private haulers was an approved method for carrying out this duty, and they exercised control over aspects of waste collection and disposal. In particular, plaintiffs argue Bell, Compton, and South Gate extensively controlled disposal companies they licensed. Each of these three defendants contracted with a transporter to collect and dispose of residential waste and licensed that same transporter to collect and dispose of commercial waste.

Defendants argue the issuance of a business license does not constitute a contract or agreement by which the city arranges for disposal because a license permits, but does not require, a licensee to conduct the business for which it is licensed. Defendants suggest plaintiffs' license argument would hold the Department of Motor Vehicles liable as an arranger because it issued vehicle registrations and drivers' licenses to waste haulers.

In support of their argument that they are not liable as arrangers, defendants rely on *Hassayampa Steering Comm. v. Arizona,* 768 F.Supp. 697 (D.Ariz.1991). In *Hassay-*

*ampa,* the plaintiffs alleged the State of Arizona was liable as an "arranger" for the disposal of hazardous substances because it issued manifests which permitted hazardous waste to be deposited at a landfill. The court refused to impose liability, holding that:

> the State's issuance of a permit does not constitute an agreement with the permittee. The manifest merely allowed the waste generator or transporter to deposit the waste at [the site] and did not require such disposal, even after the manifest was approved.

768 F.Supp. at 700.

*Hassayampa,* however, is distinguishable from this case. The *Hassayampa* court rested it decision on the issue of "owned or possessed," *not* the arranger issue. Indeed, the *Hassayampa* court noted that plaintiffs' arguments "may establish the State's activities constituted 'arranging' for disposal." *Id.* Defendant cities' DMV licensing argument is without merit. By issuing drivers' licenses and vehicle registrations, the DMV does not arrange for transport for disposal but instead only permits garbage trucks to be driven. While DMV has a duty to register such vehicles, it does not have a duty to arrange for garbage disposal such as defendant cities have. Thus, DMV's licensing cannot amount to an arrangement for disposal.

Based on the stipulated facts discussed below, the Court finds defendants Bell, Commerce, Compton, Lynwood, and South Gate arranged with a transporter for transport for disposal within the meaning of CERCLA § 107(a)(3) by issuing business licenses to private haulers. Given these defendants' statutory and common law duty to assure the pick-up and disposal of residential trash, defendants' licensing of private haulers amounted to an arrangement.

#### 1. *Bell*

In 1977 and in 1982, Bell licensed System Disposal to collect and dispose of commercial waste. The Court finds Bell arranged with a transporter for transport for disposal of commercial waste within the meaning of CERCLA § 107(a)(3) in 1977 and 1982.

---

**8.** These statutes were previously at Cal.Gov't   Code §§ 66755 et. seq.

### 2. Commerce

In 1983 and 1984, Commerce licensed Athens Disposal to collect and dispose of commercial refuse. The Court finds Commerce arranged with a transporter for transport for disposal of commercial waste within the meaning of CERCLA § 107(a)(3) in 1983 and 1984.

### 3. Compton

From 1972 to 1977, Compton licensed Murcole to engage in the business of commercial waste collection within Compton. The Court finds Compton arranged with a transporter for transport for disposal of commercial waste within the meaning of CERCLA § 107(a)(3) from 1972 to 1977.

### 4. Lynwood

From 1963 to 1969, Lynwood issued business licenses to Lynwood Disposal Service to operate a refuse collection and disposal business. In 1962, 1965–1969, 1973–1975, 1977, and 1979–1981, Lynwood licensed System Disposal to operate a refuse collection and disposal business. Lynwood required its licensees to apply for a special permit, including fingerprinting, a police background check, and approval by the City Council. [Exh. 1758; 1763; 1780] The Court finds Lynwood arranged with a transporter for transport for disposal within the meaning of CERCLA § 107(a)(3) in 1962, 1963–1969, 1973–1975, 1977, and 1979–1981.

### 5. South Gate

South Gate licensed three companies to collect and dispose of commercial waste. From 1967 to 1984, South Gate licensed CV Disposal. From 1964 to 1984, South Gate licensed System Disposal. From 1970 to 1984, South Gate licensed Murcole. Like Lynwood, South Gate had special permitting features for waste haulers. [Exh. 2344; 2345; 2355] Accordingly, the Court finds South Gate arranged with a transporter for transport for disposal from 1967 to 1984.

### 2. The County Defendants

The ▮ Athens–Woodcrest–Olivita GDD, Belvedere GDD, Firestone GDD, Mesa Heights GDD, and Walnut Park GDD each entered contracts with private disposal companies to collect, transport, and dispose of refuse. For the same reasons outlined above, the Court finds each GDD arranged for transport for disposal of waste within the meaning of CERCLA § 107(a)(3). With respect to the County itself, however, the issue presented is somewhat different. However, the Court finds it too arranged for disposal.

### a. Athens–Woodcrest–Olivita GDD

Stipulated facts 26.1 to 26.6 demonstrate the Athens–Woodcrest–Olivita GDD arranged with a transporter for transport for disposal of residential, commercial, and curbside public waste from 1963 to 1984. Accordingly, the Court finds the Athens–Woodcrest–Olivita GDD arranged with a transporter for transport for disposal of residential commercial, and curbside public waste within the meaning of CERCLA § 107(a)(3) from 1963 to 1984.

### b. Belvedere GDD

Stipulated facts 27.1 to 27.7 demonstrate the Belvedere GDD arranged with a transporter for transport for disposal of residential and commercial waste from 1953 to 1983. Stipulated facts 27.9 to 27.10 demonstrate the Belvedere GDD arranged with a transporter for transport for disposal of curbside government waste from July 1, 1964 to June 30, 1983. Accordingly, the Court finds the Belvedere GDD arranged with a transporter for transport for disposal of residential and commercial waste within the meaning of CERCLA § 107(a)(3) from 1953 to 1983, and of curbside governmental waste within the meaning of CERCLA § 107(a)(3) from July 1, 1964 to June 30, 1983.

### c. Firestone GDD

Stipulated facts 28.1 to 28.4 reveal the Firestone GDD arranged with a transporter for transport for disposal of residential, commercial, and curbside government waste from 1971 to 1984. Accordingly, the Court finds the Firestone GDD arranged with a transporter for transport for disposal of residential, commercial, and curbside governmental waste within the meaning of CERCLA § 107(a)(3) from 1971 to 1984.

### d. Mesa Heights GDD

Stipulated facts 29.1 to 29.4 reveal the Mesa Heights GDD arranged with a trans-

porter for transport for disposal of residential, commercial, and curbside governmental waste from 1969 to 1974. Accordingly, the Court finds the Mesa Heights GDD arranged with a transporter for transport for disposal of residential, commercial, and curbside governmental waste within the meaning of CERCLA § 107(a)(3) from 1969 to 1974.

### e. Walnut Park GDD

Stipulated facts 30.1 to 30.13 reveal the Walnut Park GDD arranged with transporters for the transport for disposal of residential, commercial, and curbside governmental waste from 1964 to 1983. Accordingly, the Court finds the Walnut Park GDD arranged with a transporter for transport for disposal of residential, commercial, and curbside governmental waste within the meaning of CERCLA § 107(a)(3) between 1964 and 1983.

### f. West Hollywood–Sherman GDD

Stipulated facts 31.1 to 31.4 demonstrate that the West Hollywood–Sherman GDD arranged with a transporter for transport for disposal of residential, commercial, and curbside public waste from July 1953 through December 1957 and July 1964 through June 1984. Accordingly, the Court finds that the West Hollywood–Sherman GDD arranged with a transporter for transport for disposal of residential, commercial, and curbside public waste within the meaning of CERCLA § 107(a)(3) from July 1953 through December 1957 and July 1964 through June 1984.

### g. County of Los Angeles

Plaintiffs argue the County itself is liable for two types of arrangements. First, the County arranged to haul some waste generated by County facilities in County-owned trucks. Second, plaintiffs claim the County is liable for all waste collected under the GDDs' contracts because the County also acted as an arranger with respect to that waste.

#### i. Waste Hauled in County Owned Trucks

■ From 1958 until 1981, the County disposed of some of its governmental waste by transporting that waste to disposal sites in County vehicles. [32.5] By transporting that waste in County vehicles, the County arranged for disposal of its governmental waste. [32.6] Accordingly, the Court finds the County arranged for transport for disposal of its governmental waste from 1958 through 1981 within the meaning of CERCLA § 107(a)(3) by transporting that waste in County-owned vehicles.

#### ii. Waste Collected Under GDD Contracts

■ Plaintiffs claim the County acted as an arranger with respect to waste collected under the GDDs' contracts because the County created, controlled, and operated every aspect of the GDDs. The County responds that it is an entity separate from the GDDs and is thus not liable for the conduct of the GDDs. The County argues plaintiffs seek to impose some version of corporate alter ego liability on it for the acts of its GDDs.

The Los Angeles County Board of Supervisors created the GDDs to organize garbage collection services and to provide for payment of those services. [32.49, 32.50] The Board of Supervisors governed the GDDs [32.51], and County employees had daily responsibility for operation of the GDDs [32.60]. The GDDs had no offices [32.61], owned no property [32.62], had no employees [32.59], and had no physical existence separate from the County [32.63]. Plaintiffs claim the County prepared for and brought about the transport and disposal of waste by drafting, approving, executing, monitoring, and enforcing the contracts between the GDDs and the private disposal companies.

The County claims the GDDs are entities separate from the County. The GDDs have their own budgets and pay for their expenses by charging district residents a user fee. See generally Cal.Pub.Res.Code §§ 49000 et seq. The County argues that transferring the GDDs' potential liability to it would impose an inequitable burden on County residents located outside the boundaries of the GDDs.

The Court finds the County did arrange for transport for disposal of waste by creating and controlling the GDDs. By creating the GDDs and taking day to day responsibility for their operation, the County itself arranged for transport for disposal of residen-

tial, commercial, and curbside governmental waste from within the boundaries of the GDDs within the meaning of CERCLA § 107(a)(3).

### 3. CalTrans

Plaintiffs claim CalTrans arranged with a transporter for transport for disposal by contracting with private companies during two freeway projects, the Pomona Freeway (State Route 60) and the Century Freeway (Interstate 105). CalTrans disputes that these contracts amounted to an arrangement for transport for disposal within the meaning of CERCLA § 107(a)(3).

#### a. Willco Site

■ While building the Century Freeway, CalTrans hired Papac & Sons, a private contractor, to excavate and remove material (Willco material) from the Willco site (a former landfill in Lynwood). [33.1] From March 1983 to June 30, 1983, some of the excavated Willco material was deposited at the OII site by Papac & Sons. [33.4] Plaintiffs argue CalTrans arranged with a transporter for transport for disposal by contracting with Papac & Sons to excavate and remove the Willco material.

CERCLA § 101(29) equates the CERCLA definition of "disposal" with that of the Solid Waste Disposal Act, namely:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water.

42 U.S.C. § 6903(3). Plaintiffs claim CalTrans arranged for disposal because it contracted with Papac & Sons to excavate material and then discard it by placing it elsewhere.

CalTrans asserts it is not liable as an arranger because its contract with Papac & Sons explicitly provided that any hazardous materials were not to go to a class II landfill such as the OII site. Under CalTrans' contract with Papac & Sons, CalTrans had no discretion to decide where the excavated material would be disposed other than requiring that material was to be tested during excava-

tion and was not to go to a class II landfill such as OII if hazardous. Section 107(a)(3) imposes liability on persons who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances...." CalTrans claims it does not fall within this language because it adhered to its contract by hiring Calscience Research to provide environmental consulting services at the Willco site, including monitoring the excavation being performed by Papac & Sons and characterizing the excavated material as hazardous or non-hazardous. [33.7]

Despite the exclusionary language of the contract, the Court finds CalTrans did arrange for disposal of the Willco site material. CalTrans hired a transporter to take the Willco material away, and that material ended up at OII. If that waste contained hazardous substances, CalTrans cannot escape liability by pointing to a contractual clause stating hazardous waste should not have been taken to OII. Instead, CalTrans will have to wait until a later phase of this action to rebut plaintiffs' proffered evidence that the Willco material which went to the OII site contained hazardous substances.

#### b. Pomona Freeway Right of Way

■ The current day Pomona Freeway traverses the OII site. In building the freeway, CalTrans contracted with Milburn & Sansone, a private contractor, to construct a portion of the Pomona Freeway between Woods Avenue and Arroyo Drive, which included the right of way. [33.15] Pursuant to this contract, CalTrans or its agents excavated and removed material (the Pomona material) from the right of way. [33.16] Plaintiffs argue CalTrans thus arranged for disposal of the Pomona material. CalTrans argues it did not "arrange" for disposal of the Pomona material because there is no evidence that any of the material excavated during this grading was transported and placed at the OII site.[9]

Plaintiffs have not provided enough evidence in this first phase for the Court to

---

9. CalTrans also argues plaintiffs have not produced evidence that the any material which was transported and deposited at OII contained haz-

ardous substances. This issue is appropriately contested in a later phase of this action.

determine whether CalTrans "arranged" with regard to any excavated Pomona Freeway right of way material. Plaintiffs need to show with greater factual specificity what Milburn & Sansone was hired to do and what they in fact did. Pursuant to the stipulation between the parties, plaintiffs can (if they desire) present disputed evidence on this issue before the Court makes its final ruling on this issue.

### C. Owned or Possessed Issues

■ CERCLA § 107(a)(3) provides that persons who have "arranged for disposal . . . , or arranged with a transporter for transport for disposal" are liable for those hazardous substances they "owned or possessed." The Court has previously held arranger liability under § 107(a)(3) requires that defendants own or possess waste in addition to arranging with a transporter for transport for disposal. Sept. Order at 44. Ownership or possession under § 107(a)(3) can be either actual or constructive. *Id.*

#### 1. The Municipal Defendants

##### a. Waste Actually Owned or Possessed

###### i. Governmental Waste

■ With regard to the "owned or possessed" issue, all defendant cities have stipulated that they arranged with a transporter for transport for disposal of their governmental waste. These municipal defendants admit they owned and possessed their governmental waste. Thus, each defendant city "owned or possessed" the governmental waste for which it arranged for transport for disposal within the meaning of CERCLA § 107(a)(3).

###### ii. Residential and Commercial Waste

In their trial brief, plaintiffs further argued defendant cities actually owned or possessed (as opposed to constructively owned or possessed) the residential and commercial waste for which they arranged transport because (1) individual citizens and businesses abandoned their waste on city property by placing it out for collection, (2) defendants had complete authority to decide what happened to the waste once it was set out for collection, and (3) the ownership interest of defendant cities in the refuse was acknowledged by both the cities and their disposal companies.

At oral argument, plaintiffs abandoned this argument. However, plaintiffs still assert these facts tend to show constructive ownership or possession of residential and commercial waste. Because plaintiffs no longer assert defendant cities' actually owned or possessed residential and commercial waste, the Court need not address plaintiffs' actual ownership or possession argument further.

##### b. Constructive Ownership or Possession

■ Plaintiffs contend that defendant cities constructively owned or possessed residential and commercial waste. In its prior order, the Court stated:

the broad remedial objectives of CERCLA counsel in favor of holding that this requirement may be satisfied by a showing of constructive, rather than actual, ownership or possession. Constructive ownership or possession will be established by a demonstration of the existence of defendants' exercise of control over the waste.

Sept. Order. at 44. Plaintiffs argue defendants constructively owned or possessed residential and commercial waste by controlling aspects of waste handling and disposal from the point after waste was generated by a resident or business to the point it was hauled away by the transporter.

Courts have developed two different tests to judge whether a defendant constructively owns or possesses waste within the meaning of CERCLA § 107(a)(3). The first focuses on a defendant's authority to control waste. The second examines whether defendant had a sufficient nexus with the actual owner or possessor to satisfy § 107(a)(3)'s "owned or possessed" requirement. The Court agrees with the parties that these two tests are essentially different formulations of the same legal standard. However, the Court's discussion is divided into "control" and "nexus" sections to reflect the different formulations developed by these two strands of case law.

### i. The Control Test

#### 1. Exercise of Control or Authority to Control?

██ In its prior order, the Court held constructive ownership or possession "will be established by a demonstration of the existence of defendants' exercise of control over the waste." Sept. Order at 44. Plaintiffs attempt to loosen this test by arguing authority to control, rather that the existence of actual control, can satisfy the "owned or possessed" requirement.

California law "authorize[s] and require[s] local agencies, as subdivisions of the state, to make adequate provision for solid waste handling." Cal.Pub.Res.Code § 40002. While state statutes authorizing and requiring waste collection only date back to 1980,[10] California state courts have long held local political subdivisions (such as defendant cities) have a duty to collect waste or cause it to be collected. E.g., Matula v. Superior Court, 146 Cal.App.2d 93, 303 P.2d 871 (1956). Plaintiffs argue defendant cities constructively owned or possessed residential and commercial waste because the cities had the power under state law to exercise complete dominion over the handling and disposal of such waste.

In making this argument, plaintiffs primarily rely on two cases. In United States v. Northeastern Pharmaceutical & Chemical Co., a company supervisor claimed he could not be held individually liable under § 107(a)(3) because the company, not the supervisor himself, owned or possessed the waste in question. The Eight Circuit held the supervisor was not exempt from liability because "[i]t is the authority to control ... that is critical under the statutory scheme." 810 F.2d 726, 743 (8th Cir.), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (NEPACCO).

Plaintiffs also rely on United States v. Bliss, 667 F.Supp. 1298 (E.D.Mo.1987). In Bliss, one defendant (IPC) had arranged for Bliss, a disposal company, to dispose of certain wastes actually owned and possessed by another defendant (a manufacturer). The

court found IPC liable under § 107(a)(3) because:

> IPC acted as a broker between a chemical manufacturer and a disposal company.... IPC had authority to control the place and manner of disposal; for example IPC could have chosen Bliss or any other party to dispose of the waste.

Id. at 1307.

Plaintiffs' authority argument has two flaws. First, both of the cases on which plaintiffs rely to support their position that "authority to control" is the appropriate test for determining whether a defendant constructively owned or possessed waste appear to actually hold that defendants need not own or possess waste at all for liability under CERCLA to attach. In stating it is "authority to control" which is critical, NEPACCO cited and relied on United States v. Mottolo, 629 F.Supp. 56, 60 (D.N.H.1984), which held a § 107(a)(3) defendant is liable for arranging for disposal regardless of whether he owns or possesses. The Bliss court also relied on cases which have held § 107(a)(3) does not require proof that a defendant both arranged and owned or possessed. See id. (citing United States v. Northeastern Pharmaceutical & Chemical Co., 579 F.Supp. 823, 847 (W.D.Mo.1984) ("the person arranging for the disposal is not required to actually own or possess the hazardous waste")); Mottolo, 629 F.Supp. at 60). A later opinion in the Bliss action confirms that Bliss held that "[i]t is not necessary for the person who arranges for disposal or transport to own or possess the waste." United States v. Bliss, 16 Chem. Waste Lit.Rep. 1061, 1065, 1988 WL 169818, at *6 (E.D.Mo.1988) (citing NEPACCO, 810 F.2d at 743).

Second, plaintiffs' argument that 'authority to control' demonstrates constructive possession does not conform with this Court's previous order that constructive possession would be "established by a demonstration of the existence of defendants' exercise of control over the waste." In this particular case, California statutes and case law required defendant cities to provide for solid waste col-

---

**10.** Cal.Pub.Res.Code § 40002 was enacted in 1989. It derived from former Cal.Gov't Code § 66755, which contains nearly identical language and was enacted in 1980.

lection. However, if authority to control was sufficient to establish ownership or possession, any government with police power would be liable under § 107(a)(3) so long as it arranged. While a plaintiff would still have to show an arrangement, the authority of the government to control through its police power would automatically satisfy the "owned or possessed" requirement. Focusing on authority to control makes governmental CERCLA defendants potentially liable regardless of their actual exercise of control over waste. Examining defendant cities' exercise of control is the correct means for judging whether defendant cities constructively owned or possessed waste within the meaning of CERCLA § 107(a)(3).

### 2. Defendant Cities' Exercise of Control

██ While the municipal defendants' authority to exercise control over waste does not in and of itself demonstrate constructive ownership or possession, their duty to provide for waste disposal is a fact tending to demonstrate exercise of control over waste. *See General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992). California law authorized defendant cities to make adequate provision for solid waste handling and required cities to make such provisions. Defendant cities fulfilled their duty to provide waste collection by hiring transporters to haul away residential and commercial rubbish.

In addition to the municipal defendants' duty to provide for waste collection, plaintiffs point to the control exercised by the cities through contractual provisions and city ordinances while they fulfilled their duty. Plaintiffs organize the stipulated facts into fourteen categories which they urge demonstrate exercise of control over the waste. Through contracts, licenses, and ordinances, the cities:

(1) excluded unauthorized transporters from engaging in waste handling and disposal;

(2) controlled the type of waste to be collected;

(3) controlled the type, size, and construction of waste receptacles;

(4) controlled schedules, routes, days, and hours of collection;

(5) controlled the type, construction, maintenance, and appearance of refuse collection vehicles;

(6) controlled waste handling procedures and personnel;

(7) engaged in overall supervision of waste handling and hauling;

(8) set out procedures for dealing with complaints by residents and businesses about waste collection and hauling;

(9) governed notices and other communications between the transporter and residents and businesses concerning waste collection and hauling;

(10) set rates for refuse collection services;

(11) checked up on the financial stability and reliability of the transporter; and

(12) governed billing and collection of fees for refuse collection services.

Plaintiffs argue that every city exercised control over at least one of these categories in all material years, and that most cities exercised control over all or nearly all of the twelve categories for each year in question through contractual and licensing arrangements.[11]

Defendant cities acknowledge they imposed regulatory requirements on residents, businesses, and disposal companies with respect to waste, but claim there is no evidence that any of the cities ever exercised any control over the waste itself. Plaintiffs correctly respond that control over those in actual possession is the only kind of control which could demonstrate constructive possession of waste. If one does not actually possess the waste, the only means of controlling that waste is controlling the person in actual possession.

Many of the stipulated facts do not show control over the waste. For example, contract specifications requiring disposal workers to wear clean uniforms, disposal trucks painted a uniform color with certain sized letter, and ordinances prescribing route collection times seem to have little to do with control over waste. Some categories of facts,

---

**11.** The facts for individual cities are summarized below.

on the other hand, do demonstrate control. In arranging with haulers for waste collection and disposal, defendant cities exercised significant control. Essentially, defendant cities did everything but select the specific site for disposal. Each city selected specific haulers to provide collection service to fulfill the city's waste collection responsibility and then extensively regulated those haulers through contract and ordinance.

▇▇▇ Defendant cities point to two areas in which they exercised little, if any, control. Specifically, the cities stress that plaintiffs have produced no evidence (1) which suggests any defendant city determined how or where the residential waste was to be dumped once it was collected, or (2) which suggests any defendant city had any proprietary interest in the waste haulers or the disposal of residential and commercial rubbish. Defendant cities claim these two factors are the most important means of determining whether a defendant has exercised the control necessary to make it a constructive owner or possessor.

While defendant cities are correct that prior cases have focused on these two areas, neither the cities' limited involvement in site selection nor their lack of proprietary interest in the haulers compels a finding under the facts of this case that the cities did not constructively own or possess residential and commercial waste.

a. *Determining the Place of Disposal*

In discussing indicia of control amounting to ownership or possession within the meaning of CERCLA § 107(a)(3), several courts have focused on who decided to deposit waste at the site in question. *E.g., United States v. Consolidated Rail Corp.,* 729 F.Supp. 1461, 1469 (D.Del.1990) ("The inquiry under section 9607(a)(3) turns on the determination of who made the crucial decision to dispose of hazardous substances under the Act, and thus falls within the class of responsible persons"); *United States v. A & F Materials Co.,* 582 F.Supp. 842, 845 (S.D.Ill.1984) ("the relevant inquiry is *who decided* to place the waste into the hands of a particular facility that contains hazardous wastes") (emphasis in original). *See also Hassayampa Steering Comm. v. Arizona,* 768 F.Supp. 697, 702

(D.Ariz.1991) (constructive ownership or possession "usually evidenced by having the authority to decide on behalf of the owner where the waste would be deposited") (applying nexus test).

The cases cited by defendants, however, focus on the arranger issue and not the owned or possessed issue. *Consolidated Rail* states "liability may also be extended to generators 'who did not make the crucial decision of how [the substances] would be disposed or treated, and by whom,' where '[a]ny other decision ... would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances....'" 729 F.Supp. at 1470 (quoting *United States v. Aceto Agricultural Chem. Corp.,* 699 F.Supp. 1384, 1389 (S.D.Iowa 1988) (alterations in original), *aff'd in part and rev'd in part,* 872 F.2d 1373 (8th Cir. 1989)). *A & F* does not discuss ownership or possession at all because it was not disputed the defendant in that case actually owned the waste.

Evidence that a defendant selected a site for disposal can demonstrate constructive ownership or possession. However, lack of such evidence does not necessarily mean a defendant did not constructively own or possess waste. One of the few cases to mention a defendant's role in deciding where waste was deposited in the context of determining whether that defendant constructively owned or possessed waste is *Hassayampa,* 768 F.Supp. at 702. While *Hassayampa* utilized the nexus test instead of the control test, it is nevertheless instructive. The *Hassayampa* court stated:

> The standard established by prior case law for determining when a non-generator will be constructively held to have owned or possessed the waste requires that the alleged arranger have some nexus with the actual owner, usually evidenced by having the authority to decide on behalf of the owner where the waste would be deposited.

*Id.* The *Hassayampa* court found the state governmental defendant in that case did not constructively own or possess the waste in question because, *inter alia,* the generator

made the determination to transport the waste to the site. *Id.*

There is no evidence in this case to suggest that individuals and businesses that generated the residential and commercial wastes, made a determination to transport waste to OII. Defendant cities disclaim any involvement in site selection, arguing the private disposal companies serendipitously determined where such waste was deposited.

However, the stipulated facts suggest all cities were involved in such decisions to a varying extent. Some cities required haulers to dump waste outside city limits. Some cities knew waste from within their city was being dumped at OII. At least one city, Compton, identified OII as a disposal site available for used by its contractor. In any case, each city selected the hauler who did determine the site and delegated some amount of autonomy over site selection to that transporter.

### b. *Financial Interest*

Defendant cities also argue they did not constructively own or possess residential and commercial waste because they had no proprietary interest in the waste haulers or the disposal of rubbish. According to defendants, Congress intended to impose the cost of cleanup on those who profited from transactions in hazardous waste. Several cases have held this to be an important consideration. *E.g., Lincoln v. Republic Ecology,* 765 F.Supp. at 635–36 ("an unmistakable purpose behind CERCLA's strict liability standard was to force parties who *profit* from the use and generation of hazardous wastes, or directly cause or contribute to their release, to account, in the pricing of their products, for the environmental externalities associated with improper disposal") (emphasis in original); *United States v. New Castle County,* 727 F.Supp. 854, 858 (D.Del.1989) (CERCLA "assures that those who benefit financially from a commercial activity internalize health and environmental costs of that activity into the cost of doing business") (quoting S.Rep. No. 848, 96th Cong., 2d Sess. at 13).

The evidence shows the municipal defendants had no propriety interest in the haulers with whom they arranged for disposal. However, some cities billed residents directly for collection costs. Others received a percentage of the transporter's billings and/or free collection service for governmental waste. Defendant cities who did neither still profited indirectly from contracting with private disposal companies, thus relieving themselves from having to provide collection service.

### ii. *Nexus Test*

Plaintiffs also argue defendant cities constructively owned or possessed residential and commercial waste because of the 'nexus' between defendant cities and the actual owners and possessors of the waste. The nexus test stems from *New York v. City of Johnstown,* which held "there has to be some nexus between the allegedly responsible person and the owner of the hazardous substances before a party can be held liable under 42 U.S.C. § 9607(a)(3)." 701 F.Supp. 33, 36 (N.D.N.Y.1988).

Plaintiffs point out that residential waste and commercial waste was owned or possessed by residents and businesses respectively before the waste was set out for collection. After the waste was hauled away by the disposal company, that waste was owned and possessed by the transporter. Plaintiffs conclude the municipal defendants constructively owned or possessed residential and commercial waste because of the cities' nexus with the generators of residential and commercial waste and/or the transporters of residential and commercial waste, both of whom actually owned or possessed the waste.

### 1. *Nexus with Generators*

Plaintiffs claim defendant cities' constructively owned or possessed residential and commercial waste because of their nexus with residents and businesses. As noted above, the 'nexus' test was developed in *Johnstown,* 701 F.Supp. at 36. In *Johnstown,* the state of New York brought suit to remediate problems at two solid waste management facilities. Defendants argued the state was a responsible party under § 107(a)(3) because it "arranged" for disposal by permitting or directing waste to be placed in the facilities. After stating that "there has to be some nexus between the allegedly responsible person and the owner of the haz-

ardous substances before a party can be held liable" under § 107(a)(3), *id.* at 36, the *Johnstown* court found no nexus existed because the state was attempting to remediate the hazardous waste problems at both sites. *Id.* *Johnstown* distinguished cases which had found defendants constructively owned or possesses as involving either an officer or plant supervisor of a waste-producing corporation or a hired third party who decided how to dispose of the company's waste. *Id.*

The nexus formulation was also used in *United States v. New Castle County*, 727 F.Supp. 854 (D.Del.1989). In *New Castle County*, the state of Delaware was involved in the selection of the site as well as planning its design and operation. The state also determined the type of waste suitable for disposal at the sight. After stating "there must be some nexus or relationship between the person under attack and the actual owner or possessor of the hazardous substance," *id.* at 874, the *New Castle County* court concluded the state of Delaware was not liable because it was attempting to solve the problem of the safe disposal of waste. *Id.*[12]

### 2. *Nexus with Transporters*

Plaintiffs also argue defendant cities constructively owned or possessed residential and commercial waste because of their nexus with private haulers. Plaintiffs claim the cities' contractual or licensing relationship with transporters was the source of the transporter's possession and ownership of residential and commercial waste. But for the city's approval of the contract or license, the hauler would not be able to transport and dispose of the waste.

In arguing defendant cities' nexus with private haulers made them constructive owners or possessors, plaintiffs rely on a recent Second Circuit decision, *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192 (2d Cir.1992). The plaintiffs in *Murtha* sought reimbursement for past and future clean up costs from the owner-operators of two landfills. The owner-

operator defendants then commenced third party contribution actions against numerous municipalities, alleging the municipalities were liable under § 107 because the cities had arranged for the disposal of municipal waste at the site.

In ruling on an interlocutory appeal from the district court's denial of the cities' summary judgment motion, the court wrote:

> liability under the arranger subsection requires sufficient nexus to be present between the municipality and the hazardous substances, one that does not exist in cases where the governmental unit is responsible only for promulgating disposal regulations or for permitting disposal facilities. Nonetheless, once a sufficient nexus is established (such as, in this case, by managing the disposal activities), the reasons prompting the establishment of that nexus are of no consequence.

*Id.* at 1199 (citations omitted). Plaintiffs claim defendant cities constructively owned or possessed residential and commercial waste because they too 'managed disposal activities.'

While the *Murtha* opinion does mention what might constitute a "nexus," it actually involved issues decided by this Court back in December, 1990.[13] *See id.* at 1203 (citing Court's December, 1990 order). The *Murtha* opinion addressed three rulings made in the course of the district court's denial of the cities' summary judgment motion. The district court had held:

> that CERCLA does not contain any exemption for municipal waste, and that the exclusion for household solid waste found in the Resource and Recovery Act is not incorporated into the CERCLA definition of hazardous substances. It held further that a municipality disposing of hazardous substances at a site where there is a release or threatened release of such substances may be liable under § 9607 and that plaintiffs had raised genuine issues of

---

**12.** Like the court in *Johnstown,* the *New Castle County* court found a nexus does exist where the arranger owned the hazardous substances or where a corporate employee was an arranger. *Id.* at 872 & n. 42.

**13.** In its December 5, 1990 order, the Court held the Resource and Recovery Act's exemption for household waste did not apply to exempt household waste from CERCLA's definition of hazardous substances.

material fact as to whether the municipal defendants' waste contained hazardous substances covered by CERCLA.

*Id.* at 1197.

Thus, the Second Circuit did not examine in *Murtha* the question of whether the cities in that case "owned or possessed" household waste. *Murtha*'s mention of "managing disposal activities" arose in a discussion of a city's immunity for arrangements for disposal of hazardous substances in its sovereign capacity. Fairly read, the *Murtha* decision stated only that plaintiffs could establish a nexus between a city and hazardous substances by introducing evidence on the city's management of disposal activities. The *Murtha* court did not have evidence before it on the interlocutory appeal to reach the "owned or possessed" issue.

To the extent *Murtha* can be read as stating "management of disposal activities" constitutes ownership or possession, its statements are dicta unsupported by factual analysis. In short, defendant cities are correct that *Murtha* did not address the issues presently before the Court and provides little help or guidance in determining whether defendant cities owned or possessed the residential and commercial waste at issue in this action.

The major cases involving governments have all found the governmental entity did not constructively own or possess waste. In *Johnstown,* the court found no owned or possessed nexus even though the state of New York permitted and/or directed waste to placed in the facility. 701 F.Supp. at 36. In *New Castle County,* the court found the state of Delaware did not constructively own or possess waste even though it determined the types of waste permitted to be deposited and approved the disposal of particular wastes at the facility "pursuant to its regulatory and statutory mandate." 727 F.Supp. at 874. In *Hassayampa,* the court found the state of Arizona did not constructively own or possess hazardous substances despite the fact that the state notified transporters of the availability of a landfill, issued permits allowing transporters to deposit hazardous waste at that landfill, and assisted in the design of pits into which various types of waste were directed. 768 F.Supp. at 701.

The control exercised by the defendant cities here went beyond that imposed by the defendants in *Johnstown, New Castle County, Hassayampa,* and *Lincoln.* The municipal defendants contracted with private disposal companies to haul away waste for which they had responsibility and exercised significant control over those haulers through contract and ordinance.

### iii. Conclusion

#### 1. Franchises/Contracts

Taking into account the Court's prior order, the evidence before the Court, and cases already decided under CERCLA, the Court finds defendant cities constructively owned or possessed residential and commercial waste collected under the cities' contracts with private rubbish haulers.

A substantial reason for the Court's conclusion that defendant cities did own or possess is rooted in the California statutes and case law requiring defendants to provide waste collection service. If defendants had provided that service, they clearly would have 'owned or possessed' the waste they collected. CERCLA does not permit defendants to avoid liability by simply hiring an outside contractor to perform collection services instead of the city fulfilling that duty itself. Despite contracting with private disposal companies to perform this function, defendant cities still constructively owned or possessed the waste those companies collected.

In addition to having a duty to provide for disposal service, the stipulated facts discussed below show each defendant city exercised control over residential and commercial waste when it contracted with a transporter. When both duty and control exist, CERCLA § 107(a)(3)'s "owned or possessed" requirement is satisfied.

#### a. Alhambra

From 1960–1984, the Alhambra–Athens contracts granted Athens Disposal the exclusive right to collect and dispose of all residential waste. [1.12] During the same time period, the Alhambra–Athens contracts

granted Athens Disposal a non-exclusive basis to collect and dispose of refuse from some businesses in Alhambra. [1.4] The Alhambra–Athens contracts specified the type of waste to be collected by Athens. [1.39] By ordinance, Alhambra prevented anyone except the city or its agents from removing waste from curbside or alley containers. [1.13] From 1975–1984, the Alhambra–Athens contracts required Athens to report any refuse in violation of the Alhambra Municipal Code, but that the contractor not discuss those violations with members of the public. [1.16] The Alhambra–Athens contracts required Athens immediately clean-up any spills or leaks. [1.29] While Alhambra had no ownership or proprietary interest in Athens [1.40], Alhambra billed and collected fees for refuse collection from residents and some businesses between 1960 and 1984. [1.27] The Alhambra–Athens contracts required Athens to dispose of waste outside city limits, but did not specify a particular site. [1.49] Finally, the Alhambra–Athens contracts required waste collect be done under the direction and to the satisfaction of a designated city employee. [1.51]

### b. *Bell*

The Bell–System contracts granted System Disposal the exclusive right to collect refuse from all residential dwellings of five units or fewer within the city from 1970 to 1984. [2.6] By ordinance, Bell prohibited anyone from collecting or transporting waste within Bell unless they had a contract or written permit from the city. [2.10j] The Bell–System contracts required System Disposal to immediately clean up any spills. [2.20] The Bell–System contracts required System Disposal to provide a full-time supervisor satisfactory to the Director of Public Works to supervise the contractor's employees. [2.23] While the Bell–System contracts required System to dispose of all waste outside city limits, the contracts did not specify any site. [2.31; 2.32]

### c. *Commerce*

Under the Commerce–Cannavo contracts, Commerce granted Cannavo the exclusive right to collect and remove residential waste from 1962 to 1977. [5.9] Under the Commerce–Metropolitan contracts, Commerce granted Metropolitan the exclusive right to collect residential waste from 1977 to 1984. [5.10] Commerce's contracts defined the type of waste to be collected from 1975 to 1984. [5.18] [14] While Commerce had no ownership or proprietary interest in Cannavo or Metropolitan, Commerce established the rates for waste collection and paid the waste disposal contractors for refuse collection services performed under the contracts from 1962 until 1984. [5.19; 5.20; 5.40] During that same period, Commerce required that waste collection be under the supervision and to the satisfaction of the city. [5.22] Commerce has stipulated that between 1976 and 1984, its contracts required its waste disposal contractors immediately clean up any spills. [5.32] [15] From 1962 until 1977, the Commerce–Cannavo contracts specified that Cannavo was solely responsible for selecting a disposal site located outside city limits for disposal of all waste collected. [5.40]

### d. *Compton*

Compton granted Murcole the exclusive right to collect and dispose of residential waste from 1969 to 1984. [6.7] While Compton had no ownership or proprietary interest in Murcole [6.6], Compton established the rates residents were charged for waste collection [6.14] and itself billed and collected waste collection fees from residential units [6.15].

Compton reserved the right to identify and approve the dumpsite(s) used by the city's waste disposal contractor [6.18], and from 1975 through 1984, identified OII as a disposal site available for use by Murcole [6.17]. The Compton–Murcole contracts provided that Murcole's performance would be under the direction and supervision of the City Manager, and that Murcole would obey all orders given by the City Manager with regard to the waste collection and disposal not in conflict with the contracts. [6.31]

---

14. The parties dispute whether Commerce's contracts defined the type of waste to be collected between 1962 and 1974.

15. The parties dispute whether the contracts so required from 1962 through 1975.

#### e. *Cudahy*

The Cudahy–System contract granted System the exclusive right to collect and dispose of residential waste. [7.5] The Cudahy–System contract prescribed the type of waste to be collected [7.7], and prohibited anyone other than the owner, the city, or the authorized waste collector from removing or transporting waste from a refuse container. [7.6] Although it received no monetary payments from System [7.17] and had no ownership or proprietary interest in System [7.19], Cudahy established maximum monthly rates for residential garbage collection [7.13]. By ordinance, Cudahy specified that all refuse collected within the city be lawfully disposed of in existing public dumps outside the city. [7.22]

#### f. *Lynwood*

From 1965–1984, Lynwood by ordinance prohibited any authorized person from removing any refuse containers or bins. [12.11] Between 1972 and 1984, Lynwood prohibited the burying of garbage within the city. [12.7] Lynwood established fees for collection and disposal of residential waste and certain commercial pickups between 1972 and 1984. [12.18] Between 1962 and 1978, the Lynwood–CV contracts provided that CV perform the contract under the general supervision of and to the satisfaction of the city manager [12.45], required that CV dispose of all collected refuse at some point outside the city [12.51], and provided that all refuse collected by the waste disposal contractor would become property of the contractor after collection [12.52]. At all relevant times, Lynwood's contracts defined the type of refuse to be collected by the waste disposal contractor. [12.54] Lynwood had no proprietary interest in CV [12.38], but paid CV a monthly fee and then billed and collected fees for residential waste disposal [12.64; 12.65] From 1973–1978, the Lynwood–CV contracts required CV to allow city employees to ride with the contractor's crews to supervise their activities. [12.75]

#### g. *Maywood*

By ordinance, Maywood established rates to be charged for waste disposal services between 1961 and 1984. [13.14] During that same time, Maywood defined the type of waste to be collected from within the city. [13.18] Maywood prohibited any person from accumulating garbage on any premises in the city for more than one week. [13.30] From 1957 to 1984, Maywood prohibited by ordinance any person from transporting garbage without a contract or written permission from the city from 1957 until 1984. [13.31] Maywood prohibited disposal upon any public place or vacant premises [13.35] and required waste disposal contractors to disposal of all garbage outside of city limits. [13.40]

#### h. *Montebello*

From 1952 until 1958, and from 1962 until 1984, Montebello granted certain waste disposal companies the exclusive right to collect residential waste in the city. [14.23] The Montebello–Athens contracts required Athens to dispose of refuse at a place legally empowered to accept garbage for disposal. [14.26] Montebello prescribed the type of waste disposal contractors were to collect [14.41] and the rates for collection service [14.49]. The Montebello–Athens contracts provided that the collection and removal of refuse shall be under the general supervision of the city coordinator from 1963–1972. [14.51] While the Montebello contracts did not specify a disposal site [14.61], the contracts provided that the refuse collected by Athens would become the property of the hauler [14.60] and it is undisputed individuals in the Montebello city government knew waste was being deposited at OII [14.62].

#### i. *Monterey Park*

Monterey Park granted disposal contractors the exclusive right to collect and dispose of residential waste and a nonexclusive right to collect and dispose of commercial waste. [15.9; 15.10] Monterey Park prescribed the type of waste the waste disposal contractor was to collect [15.25] and established rates for refuse collection service [15.31] From 1970–1984, the Monterey Park contracts required the waste disposal contractor to dispose of refuse at a place legally empowered to accept garbage for disposal. [15.15] [16] From 1947–1958, Monterey Park granted

---

**16.** The parties dispute whether the contracts so    provided from 1960–1969.

Harabedian permission to dispose of refuse at OII (subject to obtaining various conditional permits [15.28]). However, the Monterey Park–Athens contracts specified Athens was solely responsible for selecting a disposal site. [15.44] Monterey Park billed for and collected fees for waste collection services. [15.52] Lastly, the Monterey Park city government knew some waste being collected under its contracts was being deposited at OII. [15.56]

### j. Rosemead

Rosemead granted its contractor exclusive rights to collect residential waste [18.7] and prescribed the type of waste to be collected by the waste disposal contractor [18.8]. Its contracts require the contractor to collect waste to the satisfaction of a city employee [18.9] and provided that Rosemead would be paid a specific percentage of revenues collected by the contractor [18.20]. By ordinance, Rosemead prohibited any person other than its contractor from collecting or removing waste from residential premises within the city. [18.32] Rosemead also granted disposal companies title to certain waste. [18.35]

### k. San Gabriel

San Gabriel granted its waste disposal contractors the exclusive right to collect residential waste within the city [19.18] and defined the type of waste to be collected by the contractors. [19.19] While the San Gabriel contracts did not specify the disposal site location for waste collected under the contracts, the contracts did require waste be disposed of outside the city limits. [19.21] San Gabriel established rates for refuse collection services provided by the waste disposal contractors [19.33] and received a percentage of the gross annual receipts collected by the contractor [19.37]. San Gabriel also received free disposal service for its government waste. [19.38]

### l. South Gate

From 1957 to 1984, South Gate prohibited any person other than the owner, the city, or an authorized collector from removing waste from a waste container [23.13] and prohibited transporting garbage without a contract or written permit from the city [23.10]. At all pertinent times, South Gate prescribed the type of waste to be collected [23.22] and established rates for waste collection service [23.23]. South Gate specified that payments for collection service were to be made to the city. [23.25] The South Gate contracts required waste disposal contractors to collect waste under the supervision of and to the satisfaction of the city engineer. [23.28] The South Gate contracts specified that disposal was to be made at a place devised by the contractor and satisfactory to South Gate. [23.44]

### m. South Pasadena

South Pasadena granted its haulers an exclusive franchise for the collection of residential and commercial waste in the city. [24.15] The South Pasadena contracts defined the type of waste to be collected. [24.14] The South Pasadena contracts did not specify a site for disposal [24.23], but the South Pasadena city government knew that some of the waste collected was deposited at OII [24.20]. South Pasadena billed its residents and businesses directly for collection [24.33] and retained a specified percentage of the gross collection as a billing and collection fee/franchise fee [24.51]. The contracts required waste collection be performed to the satisfaction of a designated city official. [24.34; 24.51]

### n. Temple City

Temple City granted Community the exclusive right to collect residential waste [25.9] and defined the type of waste to be collected [25.13]. By ordinance, Temple City prevented any person from collecting or transporting refuse in the city without obtaining a license or contract from Temple City [25.14] and established requirements concerning the maximum period of time that refuse could be stored or accumulated [25.22]. Temple City required the waste disposal companies to pay a monthly fee to the city in consideration for being granted an exclusive contract for the collection of residential waste. [25.36] These facts, among others, demonstrate that each of the above cities, which had a duty to provide for waste collection and exercised control over commercial and/or residential waste and while fulfilling that duty, constructively owned or possessed the residential and

commercial waste for which it arranged for transport for disposal by contract. This finding as to the cities of Bell, Commerce, Compton, Cudahy, and Monterey Park relates only to residential waste.

### 2. Licenses

■ While those defendants who arranged for transport for disposal of commercial waste through licenses had the same duty to provide for waste disposal service, the stipulated facts do not show the same extent of control over waste. The Court concludes plaintiffs have not shown by a preponderance of the stipulated facts that defendant cities constructively possessed waste for which they arranged disposal through licenses. Most of the stipulated facts discuss defendants' contractual arrangements, not their licensing arrangements. For example, plaintiffs' owned or possessed evidence with regard to Commerce relates to Commerce's contracts with private haulers, not its licensing arrangements. Because defendants' duty to provide for collection in and of itself does not suffice for constructive possession, plaintiffs must provide additional evidence showing control by the licensing defendants.

### 3. The County Defendants

#### a. Actual Possession

■ Each County defendant admits it owned and possessed waste generated by the County. The County has stipulated that some of the waste it generated was disposed of at OII between 1958 and 1981 (although it has not stipulated its waste went to OII in each year between 1958 and 1981). Thus, the County admits waste it owned and possessed was sent to OII during this time frame. Accordingly, the Court finds the County defendants actually owned and possessed County governmental waste.

#### b. Constructive Possession

Plaintiffs and the County defendants make basically same arguments concerning constructive ownership or possession as the arguments of plaintiffs and defendant cities discussed above. While the County defendants do make one additional argument, discussed below, it is not persuasive. Based on the stipulated facts, the Court finds each County defendant constructively owned or possessed residential and commercial waste.

#### i. Independent Contractor Argument

■ The County defendants argue the disposal companies with whom they contracted were independent contractors. The County defendants claim they did not constructively own or possess residential and commercial waste because the disposal companies, as independent contractors, were not within the control of the County defendants when those haulers deposited waste at OII.

There is no statutory or CERCLA case law support for the County defendants' position and at least one court, *United States v. Bliss*, 16 Chem.Waste Lit.Rep. 1061, 1065–66, 1988 WL 169818, at *6 (E.D.Mo.1988), has rejected that argument. Section 107(b) (which sets forth all defenses available in a § 107(a) action) provides that a person shall not be held liable under § 107(a) if a release was caused solely by the act or omission of a third party. In *Bliss*, the court noted § 107(b) further provides that this third party defense is not available when the acts or omissions of the third party "occur[ ] in connections with a contractual relationship, existing directly or indirectly with the defendant." CERCLA § 107(b)(3); 42 U.S.C. § 9607(b)(3).

Even if the disposal companies hired by the GDDs were independent contractors, that fact does not affect the possible liability of the County defendants under CERCLA. As pointed out in *Bliss*, the structure of CERCLA rejects the County defendants' independent contractor argument. Section 107(a) imposes liability on those who arrange for disposal through "contract, agreement, or otherwise." Creating an exemption for independent contractors would eviscerate § 107(a)(3) by placing many contractual arrangements outside that section's "contract, agreement, or otherwise" language.

#### ii. Summary of Evidence

The GDDs and County had a duty to provide for waste disposal, and fulfilled that duty by contracting with haulers for transport for disposal. Each GDD granted haulers an exclusive right to collect all garbage

and combustible and non-combustible rubbish. Each required its hauler to dispose of waste outside the geographical boundaries of the GDD. The contracts between the GDDs and their haulers required performance under direction of and to the satisfaction of a designated county employee. The GDDs billed residents for collection services and property owners paid their fees for refuse collection to the Los Angeles County Treasurer. Each GDD sometimes received more revenue from property owners than they paid out for collection service. When this occurred, the money was used to pay for waste collection in later years.

Because the one additional argument raised by the County defendants is unpersuasive, the Court finds each County defendant constructively "owned or possessed" the residential and commercial waste for which it arranged for transport for disposal within the meaning of CERCLA § 107(a)(3).

### 4. CalTrans

CalTrans claims it did not own or possess the material removed from the Willco site and the Pomona Freeway right-of-way within the meaning of § 107(a)(3). Plaintiffs claim CalTrans has already stipulated it actually owned and actually possessed the material removed from the Willco site and the Pomona freeway right-of-way.

### i. The Contract Governing the Willco Site

▇ The parties have stipulated that in 1983 CalTrans owned the Willco site and the material found there. [33.5] However, under the contract governing the Willco site excavation, the excavated Willco material became the property of the contractor, Papac & Sons. [33.6] While CalTrans may have originally owned the material, title passed to Papac & Sons when the material was removed from the site. CalTrans thus claims it did not own or possess the material within the meaning of CERCLA § 107(a)(3) because the contract provided that Papac & Sons, who possessed the material once it was excavated, owned the material.

The Court finds CalTrans owned or possessed the Willco material within the meaning of CERCLA § 107(a)(3). Section

107(a)(3) imposes liability on any person who "arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person." At the time CalTrans arranged for transport for disposal, it did own the Willco site material. The sole fact that title subsequently passed to the transporter does not absolve CalTrans of potential liability.

### ii. Pomona Freeway Right–Of–Way

▇ CalTrans has stipulated that it acquired a portion of the OII site in the 1950s to use as a right of way for the Pomona Freeway. [33.13] CalTrans argues it cannot be held liable as an owner of the Pomona Freeway right of way material because it acquired title by eminent domain.[17]

CalTrans obtained title to both the Willco and Pomona Freeway sites by eminent domain. Section 101(20)(D) of CERCLA states:

> The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility.

42 U.S.C. § 9601(20)(D). CalTrans claims this provision of CERCLA exempts it from liability based on its having "owned or possessed" because its acquisition of the Willco and Pomona material through eminent domain was 'involuntary' under § 101(20)(D).

Section 101(20)(D) contains the statutory definition of the term "owner or operator," as in owner or operator of a facility for disposal liable under § 107(a)(1). Section 101(20)(D) prevents a governmental entity from being held liable when it involuntarily inherits a waste facility. It does not prevent CalTrans for being held liable for acquiring land through eminent domain and then arranging

---

**17.** CalTrans makes this same argument with respect to the Willco material.

to have material on that land transported for disposal.

The Court finds CalTrans owned or possessed the Pomona Freeway right of way material. However, plaintiffs still must show CalTrans arranged with a transport for transport for disposal of this material.

### D. *Whether Waste Went to the Site*

As summarized below, most of the parties have stipulated that some waste collected under the various contracts and licenses at issue in the action was disposed of at the OII site.

#### 1. *Municipal Defendants*

##### a. *Alhambra*

During the period October, 1960 through 1984, Athens Disposal disposed of some residential waste, some commercial waste, and some of the governmental waste collected in the City of Alhambra under its contracts with the city. [1.9–1.11] However, the parties have not stipulated to any specific time frame during that period when those waste streams were disposed of at OII.

##### b. *Bell*

During the period August, 1970 through December, 1984, System Disposal disposed of some residential waste collected under its contractual arrangement with Bell. [2.36] However, the parties have not stipulated to any specific years within that time frame when residential waste from Bell was disposed of at OII.

##### c. *Commerce*

Plaintiffs and defendant City of Commerce have not stipulated to any residential, commercial, or governmental refuse from Commerce being disposed of at the OII site.

##### d. *Compton*

Between 1969 and 1984, Murcole disposed of some of the residential waste and some of the governmental waste collected under its contracts with Compton at the OII site. [6.63; 6.66] During the period March, 1969 through June, 1977, Murcole also disposed of some of the commercial waste collected under its license from Compton at OII. [6.64]

These stipulations are not specific as to years.

##### e. *Cudahy*

From October, 1981 through December, 1984, System Disposal disposed of some of the residential waste collected under its contract with Cudahy. [7.33] This stipulation is not specific as to years.

##### f. *Lynwood*

Between 1962 and 1984, CV Disposal disposed of some of the residential waste collected under its contracts with Lynwood at the OII site. [12.31] This stipulation is not specific to years.

##### g. *Maywood*

From December, 1972 through 1984, System Disposal disposed of some of the residential waste collect under its contracts with Maywood. [13.56] This stipulation is not specific as to years.

##### h. *Montebello*

From February 1952 through 1958, Harabedian and Slater disposed of some of the residential waste collected under their contract with Montebello at the OII site. [14.15] During the period October 1962 through 1984, Athens Disposal disposed of some of the residential waste and some of the commercial waste collected under its contracts with Montebello. [14,18; 14,19] These stipulations are not specific as to years.

##### i. *Monterey Park*

Between 1947 and 1958, Harabedian disposed of some of the residential waste collected under his contracts with Monterey Park at the OII site. [15.62] During the period July 1960 through January 1970, CV Disposal disposed of some of the residential waste it collected under its contract with Monterey Park at the OII site. [15.63] Between January, 1970 and 1984, Athens Disposal disposed of some of the residential waste and some of the governmental waste collected under its contractual arrangement with Monterey Park at the OII site. [15.64; 15.68] During the period 1960 through 1984, Athens Disposal disposed of some of the commercial waste collected under its contractual arrangement with Monterey Park. [15.65] Monterey Park itself disposed of

some of its governmental waste collected and transported in city vehicles at OII. [15.69] None of these stipulations are specific as to years.

### j. *Rosemead*

Between 1961 and 1984, Griegorian/Modern disposed of some of the residential waste collected under its contracts with Rosemead at the OII site. [18.38] Between 1965 and 1984, Griegorian/Modern also disposed of some of the commercial waste collected under its contracts with Rosemead. [18.39] These stipulations are not specific as to years.

### k. *San Gabriel*

During the period December 1957 to March, 1964, Community Disposal Co. disposed of some of the residential waste and some of the commercial waste collected under its contracts with San Gabriel. [19.16] This stipulation is not specific as to years.

### l. *South Gate*

Between December, 1967 and December, 1984, CV Disposal disposed of some of the residential waste collected under its contractual arrangement with South Gate. [23.65] This stipulation is not specific as to years.

### m. *South Pasadena*

Between 1950 and 1969, South Pasadena Disposal disposed of some of the residential waste and some of the commercial waste collected under its contracts with South Pasadena. [24.9; 24.10] During the period 1979 through 1984, Ronara disposed of some of the residential waste and some of the commercial waste collected under its contracts with South Pasadena. [24.12] These stipulations are not specific as to years.

### n. *Temple City*

Between 1960 and 1982, Community disposed of some of the residential waste and some of the commercial waste collected under its contracts with Temple City. [25.6; 25.7] This stipulation is not specific as to years.

### 2. *County Defendants*

All of the County defendants except the Walnut Park GDD have stipulated that waste from the GDD or County was deposited at OII.

### a. *Athens–Woodcrest–Olivita GDD*

The Athens–Woodcrest–Olivita GDD has stipulated that during the period January 1970 through 1984, the G.K. Companies disposed of some of the waste collected under its contracts with the GDD at the OII site. [26.8]

### b. *Belvedere GDD*

Between 1970 and 1977, Holthe Disposal disposed of some of the waste it collected under its contract with the Belvedere GDD at the OII site. [27.16] During the period April 1, 1977 through June 30, 1983 System Disposal disposed of some of the waste it collected under its contract with the Belvedere GDD at the OII site. [27.18]

### c. *Firestone GDD*

Between January 1971 and 1984, Universal disposed of some of the waste collected under its contracts with the Firestone GDD at the OII site. [28.6]

### d. *Mesa Heights GDD*

During the period 1970 through 1974, Holthe Disposal disposed of some of the waste collected under its contracts with the Mesa Heights GDD at OII. [29.6]

### e. *Walnut Park GDD*

Defendant Walnut Park GDD and plaintiffs have not reached any stipulation regarding waste disposal at the OII site.

### f. *Los Angeles County*

Documentary evidence such as deposit tickets and other accounting records show that during the period 1958 through September, 1981, the County itself disposed of some County governmental waste at the OII site by transporting the waste to OII in County vehicles. [32.33]

### 3. *CalTrans*

### a. *Willco Site*

CalTrans has stipulated that Papac & Sons deposited some of the Willco material at the OII site during the period from March, 1983 to June 30, 1983. [33.4]

### b. *Pomona Freeway Right of Way*

CalTrans and plaintiffs have not reached any stipulation regarding whether or not ex-

cavated Pomona material was taken to the OII site.

## III. CONCLUSION

### A. *Issues Submitted for Pre–Trial Legal Determination*

1. *Do Plaintiffs Have Standing To Sue For Cost Recovery Under CERCLA § 107 or Are They Limited to Remedies For Contribution Under CERCLA § 113(f)?*

Both the language of the statute and equitable consideration lead to the conclusion that plaintiffs may bring this action under § 107(a). Accordingly, the Court finds that plaintiffs have standing to sue for cost recovery under § 107(a)(3).

2. *Do Considerations of Public Policy and a Due Regard For the Sovereign Power of a City to Protect the Public Health, Safety, and Welfare Preclude Imposition of Liability in this Case?*

Neither public policy considerations nor a due regard for a city's sovereign power to protect the public health, safety, and welfare preclude imposition of liability in this action. Defendants' sovereign power defense is no defense to potential CERCLA liability in this case.

### 3. *Joint and Several Liability*

Although the parties, to one degree or another, have submitted this issue for pretrial determination, the Court cannot give a final answer to this question before trial. Joint and several liability is available under CERCLA, but its availability depends of the severability of the harm. Individual defendants may be entitled to joint and several liability if they can show the harm they caused is divisible. The Court declines to rule on the question of divisibility because that issue is not yet ready for determination.

### 4. *Does the Doctrine of De Minimis Non Curat Lex Absolve Defendants From Liability?*

Given that plaintiffs can sue under § 107, the doctrine of 'de minimis non curat lex' cannot be asserted as a defense.

### B. *Are Defendants 'Arrangers,' And If So, For What Years?*

#### 1. *The Municipal Defendants*

Under the legal standards established by the Court's September, 1991 Order, each municipal defendant "arranged" within the meaning of CERCLA § 107(a)(3). Each either contracted with a disposal company/transporter or licensed haulers to provide for transport for disposal of specific waste streams for the years discussed in the body of this order.

#### 2. *The County Defendants*

All of the GDDs qualify as arrangers within the meaning of CERCLA § 107(a)(3). As for the County itself, it also arranged for transport for disposal within the meaning of CERCLA § 107(a)(3) by establishing and maintaining the GDDs.

#### 3. *CalTrans*

CalTrans was an arranger with respect to the material excavated from the Willco site. With respect to the material excavated from the Pomona Freeway right of way, plaintiffs have not shown sufficient facts to justify a finding that CalTrans arranged within the meaning of CERCLA § 107(a)(3).

### C. *Did Defendants "Own or Possess" the Waste For Which It Arranged Disposal, And If So, For What Years?*

#### 1. *The Municipal Defendants*

Defendant cities do not dispute they actually owned and possessed their governmental waste during the relative time periods. Furthermore, defendant cities constructively owned or possessed residential and commercial waste collected under contractual arrangements. With regard to those defendants who arranged by license, plaintiffs must introduce additional facts evincing control over the waste.

#### 2. *The County Defendants*

Both plaintiffs and the County defendants agree the County defendants actually owned and possessed government waste. The Court additionally finds the County defendants constructively owned or possessed residential or commercial waste.

### 3. CalTrans

The Court finds CalTrans owned and possessed the material excavated from both the Willco site and the Pomona Freeway right of way within the meaning of CERCLA § 107(a)(3). Although title may have passed to the actual excavator, the language of the statute covers situations in which the defendants arranges for transport for disposal while he owns the material and then subsequently passes on title.

### D. Was At Least Some of the Waste 'Owned or Possessed' by Defendants For Which Defendants Arranged Disposal, Disposed of At OII?

The stipulated facts reveal that some waste, be it residential, commercial, or governmental, was deposited at the OII site at some relevant time frame with regard to all defendants except the City of Commerce, the Walnut Park GDD, and CalTrans (with regard to the Pomona material). Plaintiffs have shown only that some waste at some relevant time was deposited at OII. Plaintiffs will have to provide more exact proof on this issue in later phases of the action.

Upon completion of all proceedings in this matter, the Court will expand upon this order and file final Findings of Fact and Conclusions of Law or a final memorandum order.